IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 16-cv-0969-WJM

FRONT RANGE EQUINE RESCUE,

    Petitioner,

v.

BUREAU OF LAND MANAGEMENT, and
INTERIOR BOARD OF LAND APPEALS,

    Respondents.

## ORDER REQUIRING FURTHER BRIEFING

Petitioner Front Range Equine Rescue seeks judicial review of a decision of the Interior Board of Land Appeals ("IBLA"), a body within the U.S. Department of the Interior ("Interior Department") that hears administrative appeals from certain decisions made by the Bureau of Land Management ("BLM") (together, "Respondents").

Underlying this dispute, although not directly before the Court, is a BLM decision to eliminate (by relocation) a certain herd of wild horses in western Colorado, allegedly in violation of the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), 16 U.S.C. §§ 1331 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* Petitioner appealed this decision to the IBLA, but the IBLA dismissed the appeal for lack of standing under Interior Department regulations specifically governing standing to appeal to the IBLA. That finding—a lack of regulatory standing— is what Petitioner challenges in this action.

For the reasons explained below, the Court requires further briefing. Stated

plainly, it is not clear why Petitioner needs to bring this challenge. If the IBLA has rejected Petitioner's standing to pursue the Interior Department's internal administrative appeals process, the Court cannot see why this does not establish the futility of administrative exhaustion, thus giving Petitioner the opportunity to file a challenge in district court to BLM's decision to eliminate the wild horse herd. Thus, the Court requires briefing on why it should not grant Petitioner leave to amend its complaint to state a direct challenge to BLM's decision, thus mooting the question of whether the IBLA properly denied regulatory standing.

## I. BACKGROUND

Through the Wild Horse Act, Congress declared that wild horses are "an integral part of the natural system of the public lands." 16 U.S.C. § 1331. "All wild free-roaming horses" are therefore "under the jurisdiction of the Secretary [of the Interior] for the purpose of management and protection." *Id.* § 1333(a).

One of the Interior Department's duties under the Wild Horse Act is to prevent overpopulation of wild horses. *Id.* § 1333(b)(1). If, based on various information sources, the Interior Department finds that overpopulation exists, it is required to "remove excess animals from the range so as to achieve appropriate management levels." *Id.* § 1333(b)(2).

Rio Blanco County, Colorado, contains a section of wild horse habitat that BLM has named the "West Douglas Herd Area." (Administrative Record (ECF No. 13) ("R.") at 7974.) In July 2015, BLM determined that all of the approximately 350 horses in and near the West Douglas Herd Area were "excess horses." (R. at 7975.) Later that same month, the Field Manager for the BLM field office in charge of the West Douglas Herd

Area issued a Decision Record approving a plan to capture and relocate all of those horses. (R. at 7964–70.)

In August 2015, Petitioner appealed that Decision Record to the IBLA. (R. at 8728.) The Interior Department filed a motion with the IBLA to dismiss that appeal for lack of standing under the following Interior Department regulation:

> (a) Any party to a case who is adversely affected by a decision of the [BLM] . . . has the right to appeal to the [IBLA] . . .
>
> * * *
>
> (d) A party to a case is adversely affected, as set forth in paragraph (a) of this section, when that party has a legally cognizable interest, and the decision on appeal has caused or is substantially likely to cause injury to that interest.

43 C.F.R. § 4.410. Specifically, the Interior Department argued that Petitioner had failed to show that it was adversely affected by the Decision Record. (R. at 9273.)

In response, Petitioner argued that it had "organizational standing" under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). (R. at 9345–46.) In brief, *Havens* held that a fair housing organization had standing in its own right to challenge alleged violations of the Fair Housing Act (*i.e.*, without regard to whether it had associational standing to bring such a challenge) because those alleged violations had "perceptibly impaired [the organization's] ability to provide counseling and referral services for low- and moderate-income homeseekers . . . . Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources— constitutes far more than simply a setback to the organization's abstract social interests." 455 U.S. at 379 (citation omitted).

Following *Havens*'s lead, Petitioner submitted a declaration from its president

3

and founder, Hilary Wood. (R. at 9355–58.) Wood's declaration describes Petitioner as

a non-profit organization

> dedicated to stopping cruelty and abuse of horses through rescue and rehabilitation. [Petitioner] is actively involved in the rescue, rehabilitation and adoption to good homes of domestic and wild horses, and in educational efforts regarding responsible horse ownership and wild horse roundups. . . .
>
> One of [Petitioner's] primary goals is to protect wild horses on federal public lands. To that end, [Petitioner] has expended significant time and resources to monitor and comment on unjustified or harmful roundups conducted by [BLM]. . . .
>
> [Petitioner] has diverted, and continues to divert time, money, and efforts away from its other work in order to evaluate, research, investigate, and combat BLM's illegal conduct affecting wild horses. For example, [Petitioner] has commented on at least ten BLM management actions causing harm to wild horse health since January 2015, including BLM's actions in connection with the [West Douglas Herd Area]. [Petitioner] has also undertaken additional investigations and evaluations of BLM's efforts in the [West Douglas Herd Area], expending resources that would have been used on other organizational missions, but for BLM's illegal conduct in connection with those herds.
>
> Because of BLM policies harming the health of wild horses across the country, [Petitioner] has been and continues to be forced to expend its limited resources investigating and tracking BLM's unlawful actions. The resources that have been used for these projects would otherwise have been used for [Petitioner's] other campaigns and organizational goals, including its efforts to keep wild horses free from roundups and confinement in BLM long-term holding areas, adoption of rescued or removed wild horses to good homes, and educational efforts regarding wild horse roundups, the cruelty of horse slaughter, and responsible horse ownership.
>
> [Petitioner] has a national campaign to "Save the Wild Horses." [Petitioner's] mission to protect and sustain wild horses on federal public lands is frustrated by BLM's plan to eliminate the horses in the [West Douglas Herd Area] such that the future health of the herd in Colorado is jeopardized.

4

> The interests of [Petitioner] have been and will continue to be adversely affected if BLM is permitted to continue its practice of zeroing out entire herds of wild horses.

(R. at 9355–57.)

By decision dated March 31, 2016, the IBLA ultimately found this declaration inadequate to meet the "adversely affected" requirement of 43 C.F.R. § 4.410. (R. at 9397–414.)[1] The IBLA first summarized two of its own recent decisions (one of which dismissed a nearly identical appeal from Petitioner relating to a wild horse roundup in Oregon), and found from those opinions that Petitioner was simply pursuing its stated mission and "[t]he activity that gives meaning to [Petitioner's] mission cannot also be said to cause injury to that mission." (R. at 9407–08 (internal quotation marks omitted).) As for *Havens*, the IBLA cited lower court opinions supposedly clarifying its meaning and showing that *Havens* does not dictate that Petitioner has standing. (R. at 9408–13.)

The following month, Petitioner filed this action, seeking review of the IBLA's decision under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* (ECF No. 1.)

## II. THE COURT'S CONCERNS

Petitioner argues to this Court that "adversely affected" under the Interior Department's regulation must be interpreted under *Havens* and lower court decisions interpreting it: "Because there is no body of law established by the IBLA in analyzing *Havens*-type standing under 43 [C.F.R. §] 4.410, the only logical approach is to apply federal case law and to consider it as weighty precedent in reaching a decision." (ECF

---

[1] Also available at *Front Range Equine Rescue*, 187 IBLA 269, 2016 WL 1624054 (2016).

5

No. 14 at 14.)  This is especially appropriate, according to Petitioner, because "[t]he IBLA routinely—and in the challenged opinion in particular—cites federal case law standing doctrine in reaching its conclusions."  (*Id.* at 18 n.4.)

Respondents counter that federal case law interpreting Article III standing under the U.S. Constitution is irrelevant: "Despite Petitioner's insistence that it has standing under Article III, it is the standing requirements in 43 C.F.R. § 4.410 that determine whether Petitioner had standing to appeal to the IBLA, not Article III case law."  (ECF No. 18 at 21–22.)  Respondents characterize the IBLA's underlying opinion as resting solely on the IBLA's prior case law interpreting "adversely affected," with an analysis of *Havens* and related precedent solely because Petitioner raised *Havens* in its briefing.  (*See id.* at 22, 27–30.)  This is inaccurate.  The IBLA's opinion interweaves its own precedent and *Havens*-related precedent, and there is never any statement to the effect of, *e.g.*, "*Havens* is irrelevant, but even if it did apply . . ."  Rather, drawing from *Havens*-related precedent as much as its own precedent, the IBLA opinion concludes that Petitioner does not have standing under 43 C.F.R. § 4.410.  (R. at 9408–13.)

All of this raises interesting questions about the scope of *Havens*-style organizational standing, about the distinction between Article III standing and administrative standing, about what to do when an administrative agency uses federal standing doctrine to interpret its own regulation regarding standing, etc.  But the Court first wishes to confirm that it actually needs to answer these questions.

Petitioner's ultimate goal, it appears, is to have the Decision Record vacated.  To achieve that goal, Petitioners would need to file an action under the APA (just like the present action) claiming that BLM acted arbitrarily, capriciously, or in a manner

6

otherwise contrary to law.  *See* 5 U.S.C. § 706(2).  But a party may not bring such a suit unless there is a "final agency action," 5 U.S.C. § 704, and such final action typically does not exist until the party has exhausted administrative remedies made available by the agency, *see generally* 4 Koch & Murphy, *Admin. L. & Prac.* § 12:21 (3d ed., Feb. 2017 update).  An exception to the exhaustion requirement exists, however, when exhaustion would be futile.  *Id.* § 12:22[4].

Here, the IBLA's dismissal of Petitioner's appeal on regulatory standing grounds seems to demonstrate that Petitioner's attempts to exhaust have been and will continue to be futile.  Thus, it is unclear to the Court what interest will be served by the instant lawsuit as presently framed and postured, as compared to a lawsuit directly challenging the Decision Record.  Indeed, the IBLA's opinions in this case and in Petitioner's case arising out of Oregon appear to establish that Petitioner has structured itself and pursued its mission in such a way that it cannot satisfy the Interior Department's "adversely affected" regulation, and the Interior Department has therefore, in effect, granted Petitioner a go-directly-to-district-court pass for any decision that would reduce the number of wild horses.  *See id.* § 12:22[9] (discussing exception to exhaustion requirement when an agency has prejudged whatever issue would be litigated through administrative channels).

Conceivably, Petitioner has an interest specifically in demonstrating its standing before the IBLA.  Petitioner may believe, for example, that the IBLA is a cheaper, quicker forum for reversing BLM decisions (as compared to APA actions in federal court), and so Petitioner would prefer to take its grievances to the IBLA in the first instance.  If so, the Court cannot withhold a ruling from Petitioner on whether the IBLA

7

violated the APA when it declared that Petitioner lacks regulatory standing.

However, if Petitioner has no particular interest in litigating before the IBLA and was doing so simply because it believed it must before challenging the Decision Record in federal court, the Court is inclined to the view that Petitioner is incorrect. And if so, the Court sees no reason to resolve the questions presented by the parties' merits briefs. Instead, it appears most efficient simply to grant leave to Petitioner to amend its complaint to state an APA claim against the Decision Record directly, and proceed accordingly.[2]

### III.  CONCLUSION

For the reasons set forth above, the Court ORDERS the parties, on or before **October 18, 2017**, to each submit a brief of no more than 10 pages addressing the following questions:

1.  Whether the IBLA's opinion demonstrates that administrative exhaustion would be futile (or otherwise excused) in Petitioner's circumstance, thus permitting Petitioner to file a direct APA challenge to the Decision Record; and

2.  Whether the Court should permit Petitioner to amend its complaint to state a direct APA challenge to the Decision Record.

---

[2] Such a procedural posture would not eliminate the *Havens* standing question. If this case is converted into a direct challenge to the Decision Record, nothing would prevent Respondents from arguing that Petitioner lacks Article III standing (under *Havens* or otherwise). The Court will not prejudge that issue. Whatever the answer, the question should be raised (if at all) in a context where Article III is actually at stake—rather than in the present posture, where Petitioner asks the Court to treat *Havens* as "weighty precedent" in deciding whether the IBLA abused its discretion. (ECF No. 14 at 14.)

Dated this 28th day of September, 2017.

BY THE COURT:

_____
William J. Martinez
United States District Judge