**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-0969-WJM

FRONT RANGE EQUINE RESCUE,

      Petitioner,

v.

BUREAU OF LAND MANAGEMENT, and
INTERIOR BOARD OF LAND APPEALS,

      Respondents.

---

**ORDER MAKING ABSOLUTE ORDER TO SHOW CAUSE AND DISMISSING CASE
FOR LACK OF SUBJECT MATTER JURISDICTION**

---

Petitioner Front Range Equine Rescue seeks judicial review of a decision of the
Interior Board of Land Appeals ("IBLA"), a body within the U.S. Department of the
Interior ("Interior Department") that hears administrative appeals from certain decisions
made by the Bureau of Land Management ("BLM") (together, "Respondents").

Underlying this dispute, although not directly before the Court, is a BLM decision
to eliminate (by relocation) a certain herd of wild horses in western Colorado, allegedly
in violation of both the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"),
16 U.S.C. §§ 1331 *et seq.*, and the National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.*  Petitioner appealed this decision to the IBLA, but the IBLA
dismissed the appeal for lack of standing under Interior Department regulations
specifically governing standing to appeal to the IBLA.

That finding—a lack of regulatory standing—is what Petitioner originally

challenged in this action.  As will become clear below, however, the Court has now

been presented with a question of Article III standing, which it raised by an Order to

Show Cause dated October 19, 2017.  (ECF No. 32.)  For the reasons explained below,

the Court makes that Order to Show Cause absolute because it finds that this dispute is

moot and that the capable-of-repetition-yet-evading-review exception does not apply.

Accordingly, this case will be dismissed for lack of subject matter jurisdiction.  The Court

will nonetheless retain jurisdiction to evaluate the jurisdictional consequences of any

change in the circumstances that have led the Court to issue this order.

## I.  BACKGROUND

### A.  The Wild Horse Act

Through the Wild Horse Act, Congress declared that wild horses are "an integral

part of the natural system of the public lands."  16 U.S.C. § 1331.  "All wild free-roaming

horses" are therefore "under the jurisdiction of the Secretary [of the Interior] for the

purpose of management and protection."  *Id.* § 1333(a).

One of the Interior Department's duties under the Wild Horse Act is to prevent

overpopulation of wild horses.  *Id.* § 1333(b)(1).  If the Interior Department finds that

overpopulation exists, it is required to "remove excess animals from the range so as to

achieve appropriate management levels."  *Id.* § 1333(b)(2).

### B.  The Decision to Remove Horses from the West Douglas Herd Area

Rio Blanco County, Colorado, contains a section of wild horse habitat that BLM

has named the "West Douglas Herd Area."  (Administrative Record (ECF No. 13) ("R.")

at 7974.)  In 2014 and 2015, Respondents studied the West Douglas Herd Area with an

eye toward relocating all of its horses, and concluded, among other things, that a plan

for such relocation would not require an environmental impact statement because

relocation would have no new significant environmental impact.  (R. at 8196.)[1]

In July 2015, BLM determined that all of the horses in and near the West Douglas Herd Area (expected to reach a population of approximately 350 in the near future) were "excess horses."  (R. at 7975.)  Later that same month, the Field Manager for the BLM field office in charge of the West Douglas Herd Area issued a Decision Record[2] approving a plan to capture and relocate all of those horses.  (R. at 7964–70.)  In particular, the Decision Record approved a gathering operation to begin on September 14, 2015, targeting 167 horses.  (R. at 7964.)  Regarding "those wild horses remaining [after the September 2015 roundup]," the Decision Record stated that

> BLM would begin utilizing bait and water trapping gather methods to gather and remove excess wild horses . . . as soon as funding is allocated and space is available at short and long-term holding facilities. . . .
>
> * * *
>
> . . . the proposed gather would be conducted over a period of several years using a variety of gather techniques . . . .

(R. at 7964–65.)

---

[1] NEPA requires that, "[b]efore an agency may take 'major Federal actions significantly affecting the quality of the human environment,' an agency must prepare an environmental impact statement ('EIS') in which the agency considers the environmental impacts of the proposed action and evaluate[s] 'alternatives to the proposed action,' including the option of taking 'no action.'"  *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (quoting 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14(d)).  However, "[i]f an agency is uncertain whether the proposed action will significantly affect the environment, it may prepare a considerably less detailed environmental assessment" ("EA") to determine whether an EIS is necessary.  *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006) (citing 40 C.F.R. § 1508.9).  If the EA concludes that the proposed project will have a significant effect on the environment, the agency must then develop an EIS; if not, the agency then issues a "Finding of No Significant Impact" ("FONSI"), and no further agency action is required.  *Id.*

[2] In APA cases, this document is more traditionally known by the prepositional phrase, "Record of Decision."  But the parties here have routinely referred to it as the "Decision Record" and so the Court will follow suit.

### C.    Petitioner's IBLA Appeal

In August 2015, Petitioner appealed that Decision Record to the IBLA.  (R. at 8728.)  The Interior Department filed a motion with the IBLA to dismiss that appeal for lack of standing under the following Interior Department regulation:

> (a) Any party to a case who is adversely affected by a decision of the [BLM] . . . has the right to appeal to the [IBLA] . . .
>
> * * *
>
> (d) A party to a case is adversely affected, as set forth in paragraph (a) of this section, when that party has a legally cognizable interest, and the decision on appeal has caused or is substantially likely to cause injury to that interest.

43 C.F.R. § 4.410.  Specifically, the Interior Department argued that Petitioner had failed to show that it was adversely affected by the Decision Record.  (R. at 9273.)

In response, Petitioner argued that it had "organizational standing" under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  (R. at 9345–46.)  In brief, *Havens* held that a fair housing organization had standing in its own right to challenge alleged violations of the Fair Housing Act (*i.e.*, without regard to whether it had associational standing to bring such a challenge) because those alleged violations had "perceptibly impaired [the organization's] ability to provide counseling and referral services for low- and moderate-income homeseekers . . . .  Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."  455 U.S. at 379 (citation omitted).

Following *Havens*'s lead, Petitioner submitted a declaration from its president and founder, Hilary Wood.  (R. at 9355–58.)  Wood's declaration describes Petitioner as

a non-profit organization

dedicated to stopping cruelty and abuse of horses through rescue and rehabilitation.  [Petitioner] is actively involved in the rescue, rehabilitation and adoption to good homes of domestic and wild horses, and in educational efforts regarding responsible horse ownership and wild horse roundups. . . .

One of [Petitioner's] primary goals is to protect wild horses on federal public lands.  To that end, [Petitioner] has expended significant time and resources to monitor and comment on unjustified or harmful roundups conducted by [BLM]. . . .

[Petitioner] has diverted, and continues to divert time, money, and efforts away from its other work in order to evaluate, research, investigate, and combat BLM's illegal conduct affecting wild horses.  For example, [Petitioner] has commented on at least ten BLM management actions causing harm to wild horse health since January 2015, including BLM's actions in connection with the [West Douglas Herd Area].  [Petitioner] has also undertaken additional investigations and evaluations of BLM's efforts in the [West Douglas Herd Area], expending resources that would have been used on other organizational missions, but for BLM's illegal conduct in connection with those herds.

Because of BLM policies harming the health of wild horses across the country, [Petitioner] has been and continues to be forced to expend its limited resources investigating and tracking BLM's unlawful actions.  The resources that have been used for these projects would otherwise have been used for [Petitioner's] other campaigns and organizational goals, including its efforts to keep wild horses free from roundups and confinement in BLM long-term holding areas, adoption of rescued or removed wild horses to good homes, and educational efforts regarding wild horse roundups, the cruelty of horse slaughter, and responsible horse ownership.

[Petitioner] has a national campaign to "Save the Wild Horses."  [Petitioner's] mission to protect and sustain wild horses on federal public lands is frustrated by BLM's plan to eliminate the horses in the [West Douglas Herd Area] such that the future health of the herd in Colorado is jeopardized.  The interests of [Petitioner] have been and will continue to be adversely affected if BLM is permitted to continue its

practice of zeroing out entire herds of wild horses.

(R. at 9355–57.)

By decision dated March 31, 2016, the IBLA ultimately found this declaration inadequate to meet the "adversely affected" requirement of 43 C.F.R. § 4.410.  (R. at 9397–414.)[3]  The IBLA first summarized two of its own recent decisions (one of which dismissed a nearly identical appeal from Petitioner relating to a wild horse roundup in Oregon[4]), and found from those opinions that Petitioner was simply pursuing its stated mission and "[t]he activity that gives meaning to [Petitioner's] mission cannot also be said to cause injury to that mission."  (R. at 9407–08 (internal quotation marks omitted).)  As for *Havens*, the IBLA cited lower court opinions supposedly clarifying its meaning and showing that *Havens* does not dictate that Petitioner has standing.  (R. at 9408–13.)

The following month, Petitioner filed this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, seeking review of the IBLA's decision. (ECF No. 1.)

## D.    The Parties' Arguments on the Merits

In its opening appeal brief, Petitioner argued that "adversely affected" under the Interior Department's regulation must be interpreted under *Havens* and lower court decisions interpreting it: "Because there is no body of law established by the IBLA in analyzing *Havens*-type standing under 43 [C.F.R. §] 4.410, the only logical approach is to apply federal case law and to consider it as weighty precedent in reaching a

---

[3] Also available at *Front Range Equine Rescue*, 187 IBLA 269 (2016).

[4] *See Front Range Equine Rescue*, 187 IBLA 28 (2016); *see also Front Range Equine Rescue v. BLM*, 2017 WL 1483335 (D. Or. Mar. 13, 2017) (recommending affirmance of IBLA's decision); 2017 WL 1483318 (D. Or. Apr. 23, 2017) (adopting recommendation).

decision." (ECF No. 14 at 14.)[5]  This would be especially appropriate, according to Petitioner, because "[t]he IBLA routinely—and in the challenged opinion in particular—cites federal case law standing doctrine in reaching its conclusions." (*Id.* at 18 n.4.)

Respondents countered that federal case law interpreting Article III standing under the U.S. Constitution is irrelevant: "Despite Petitioner's insistence that it has standing under Article III, it is the standing requirements in 43 C.F.R. § 4.410 that determine whether Petitioner had standing to appeal to the IBLA, not Article III case law." (ECF No. 18 at 21–22.)  Respondents characterized the IBLA's underlying opinion as resting solely on the IBLA's prior decisions interpreting its "adversely affected" regulation, with an analysis of *Havens* and related precedent solely because Petitioner raised *Havens* in its briefing. (*See id.* at 22, 27–30.)

## E.     The Court's Original Concerns

Respondents' characterization of the IBLA's opinion is inaccurate.  The IBLA interwove its own precedent and *Havens*-related precedent, and never included any statement to the effect of, *e.g.*, "*Havens* is irrelevant, but even if it did apply . . ."  Rather, drawing from *Havens*-related precedent as much as its own precedent, the IBLA concluded that Petitioner does not have standing under 43 C.F.R. § 4.410.  (R. at 9408–13.)

This raises interesting questions about the scope of *Havens*-style organizational standing, about the distinction between Article III standing and administrative standing, about what to do when an administrative agency uses federal standing doctrine to interpret its own regulatory standing requirements, and so forth.  But the Court became

---

[5] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination.

concerned that answers to these questions may be unnecessary.

Petitioner's ultimate goal, it appears, is to have the Decision Record vacated.  To achieve that goal, Petitioner would need to file an APA action claiming that BLM acted arbitrarily, capriciously, or in a manner otherwise contrary to law when reaching the decision embodied in the Decision Record.  *See* 5 U.S.C. § 706(2).  But a party may not bring such a suit unless there is a "final agency action," 5 U.S.C. § 704, and such final action typically does not exist until the party has exhausted administrative remedies made available by the agency, *see generally* 4 Koch & Murphy, *Admin. L. & Prac.* § 12:21 (3d ed., Feb. 2017 update) ("*Koch & Murphy*").  With respect to BLM decisions, an appeal to the IBLA is usually treated as an administrative remedy that challengers must exhaust.  *See Farrell-Cooper Mining Co. v. U.S. Dep't of Interior*, 864 F.3d 1105, 1115–16 (10th Cir. 2017).

An exception to the exhaustion requirement exists, however, when exhaustion would be futile.  *Koch & Murphy* § 12:22[4].  Here, the IBLA's dismissal of Petitioner's appeal on regulatory standing grounds suggested to the Court that Petitioner had established the futility of exhaustion.

In this light, it was unclear to the Court what interest would be served by the instant lawsuit as presently framed and postured, as compared to a lawsuit directly challenging the Decision Record.  Indeed, the IBLA's opinion in this case and in the similar case arising out of Oregon appear to establish that Petitioner has structured itself and pursued its mission in such a way that it cannot satisfy the Interior Department's "adversely affected" regulation.  One might argue, then, that the Interior Department has unintentionally granted Petitioner a go-directly-to-district-court pass for

any decision that would reduce the number of wild horses.  *See id.* § 12:22[9]

(discussing exception to exhaustion requirement when an agency has prejudged

whatever issue would be litigated through administrative channels).

Conceivably, however, Petitioner could have an interest specifically in

demonstrating its standing before the IBLA.  Petitioner may believe, for example, that

the IBLA is a cheaper, quicker forum for reversing BLM decisions (as compared to APA

actions in federal court), and so Petitioner would prefer to take its grievances to the

IBLA in the first instance.  The Court did not wish to foreclose this possibility.  But, if

Petitioner had no particular interest in litigating before the IBLA and was doing so simply

because it believed it was required to do so before challenging the Decision Record in

federal court, the Court wished to explore the possibility that Petitioner might amend its

complaint to state an APA claim against the Decision Record directly, given that

administrative exhaustion appeared to be excused.  In other words, the Court was

concerned that resolving an intermediate question regarding regulatory standing would

be a waste of time because, *even if the Court affirmed the IBLA*, nothing would prevent

Petitioner from filing a direct APA challenge to the Decision Record, pleading futility of

exhaustion in light of Petitioner's lack of regulatory standing.[6]

Given this concern, the Court ordered the parties to submit further briefing on two

questions:

> 1.  Whether the IBLA's opinion demonstrates that
>     administrative exhaustion would be futile (or otherwise
>     excused) in Petitioner's circumstance, thus permitting
>     Petitioner to file a direct APA challenge to the Decision

---

[6] Such a procedural posture would not eliminate the *Havens* standing question.  In a direct challenge to the Decision Record, nothing would prevent Respondents from arguing that Petitioner lacks Article III standing (under *Havens* or otherwise).

Record; and

2.  Whether the Court should permit Petitioner to amend its
    complaint to state a direct APA challenge to the Decision
    Record.

(ECF No. 29 at 8.)

## F.    The Parties' Responses and the Order to Show Cause

Petitioner's supplemental brief agreed with the Court that the IBLA's decision demonstrated the futility of administrative exhaustion, and so Petitioner should be allowed to challenge the Decision Record directly.  (*See generally* ECF No. 31.)  In particular, Petitioner expressed no interest in establishing regulatory standing before the IBLA.

Respondents' supplemental brief argued that exhaustion before the IBLA was still required, and not excused.  (ECF No. 30 at 2–6.)  More importantly, however, Respondents argued that a direct challenge to the Decision Record would be partially moot and otherwise unripe.

Regarding mootness, Respondents announced that the initial gather of 167 horses had been completed on September 24, 2015.  (ECF No. 30 at 7.)[7]  Regarding ripeness, Respondents announced that BLM had entered into a settlement agreement ("Settlement Agreement") in a direct APA challenge to the Decision Record filed by a different organization, Friends of Animals, in the United States District Court for the District of the District of Columbia.  (*Id.* at 8–11, referring to *Friends of Animals v. Jewell*, No. 1:15-cv-01500-CRC (D.D.C., filed Sept. 15, 2015) ("*Friends of Animals*").)  That court ruled in February 2017 that any challenge to the initial gather of 167 horses

---

[7] This was the first time either party had made the Court aware of this rather significant fact.

was moot, and any challenge to later gathers is prudentially unripe because "BLM will necessarily conduct at least some level of environmental analysis [as to those gathers], issue public notice of the impending gather, and permit challenges to the decision administratively or in court." *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131, 132 (D.D.C. 2017). The petitioner appealed to the D.C. Circuit, and during that appeal the parties entered into the Settlement Agreement, dated September 20, 2017, which provides in relevant part as follows:

> (1) the Decision Record for the 2015 West Douglas Herd Area ("WDHA") Wild Horse Gather and Removal . . . Authorized the removal of 167 wild horses and does not authorize future removals without additional decision-making;
>
> (2) 167 wild horses were removed from the WDHA in 2015;
>
> (3) the U.S. Bureau of Land Management ("BLM") will issue a new decision record before authorizing future removals of wild horses from the WDHA;
>
> (4) for a period of two years, before issuing a decision record authorizing a future removal in the WDHA, BLM will provide the public with a [*sic*] draft environmental documentation for review and 30 days to comment on the draft before issuing a final decision;
>
> (5) for a period of two years, public notice of final gather/removal decisions in the WDHA shall be given 31–76 days prior to the proposed gather;
>
> * * *
>
> (8) Nothing in this Settlement Agreement shall be construed to make any other person or entity not executing this Settlement Agreement a third-party beneficiary to this Settlement Agreement. . . .

(ECF No. 30-1 at 1, 3.)[8]

---

[8] Again, this was the first any party had said to this Court about this very important document.

Given the Settlement Agreement, Friends of Animals voluntarily moved for dismissal of its appeal, attaching the Settlement Agreement. (*See Friends of Animals v. Zinke*, No. 17-5036 (D.C. Cir.), Unopposed Motion for Dismissal of the Appeal (filed Sept. 20, 2017).) The D.C. Circuit granted the motion.

In light of this new information, the Court ordered Petitioner to show cause why this case should not be dismissed for lack of Article III standing, given that a disposition in favor of Petitioner even on the original question—*i.e.*, a ruling that the IBLA's regulatory standing decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A)—would seem to have no real-world consequences. (ECF No. 32.) The most the IBLA could do on remand would be to grant Petitioner regulatory standing and then review a decision record that appears to have no ongoing force.

The Court has now received the parties' respective briefs on this order to show cause (ECF Nos. 33, 34) and is prepared to rule.

## II. LEGAL STANDARD

The Court's order to show cause is functionally equivalent to a motion from Respondents under Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of subject matter jurisdiction.

"[Federal] [d]istrict courts have limited subject matter jurisdiction and may [only] hear cases when empowered to do so by the Constitution and by act of Congress." *Randil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1225 (10th Cir. 2004) (internal quotation marks omitted). "A court lacking jurisdiction cannot render judgment but must dismiss the case at any stage of the proceedings in which it becomes apparent that

jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

Rule 12(b)(1) motions generally take one of two forms: a facial attack or a factual attack. Here, the Court faces a factual attack, which gives the Court "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). In such circumstances, the Court's reference to evidence beyond the pleadings will not convert the motion to one under Rules 56 or 12(b)(6), unless the jurisdictional question is intertwined with the merits of the case. *Id.* Here, the jurisdictional question is independent from the merits because the effect of gathering 167 horses and the effect of the Settlement Agreement have no bearing on whether the IBLA's regulatory standing decision or the Decision Record is arbitrary or capricious under the APA.

### III. ANALYSIS

#### A. Mootness & Final Agency Action

Petitioner does not dispute that its challenge is moot as to the 167 horses already gathered. Petitioner asserts, however, that its challenge is much broader than that. Petitioner emphasizes that the Decision Record authorizes the initial gather of 167 horses and *also* an indeterminate number of future gathers over several years, with the eventual goal of removing all horses from the West Douglas Herd Area. (ECF No. 33 at 2–3; *see also* Part I.B, above.) Petitioner believes that the Settlement Agreement actually has no relevance to the future gathers because Respondents have not formally rescinded the Decision Record, and the Decision Record "still asserts BLM's intent to zero out the [West Douglas Herd Area] over an extended period of time, and BLM's belief that such conduct is permissible under the Wild Horse Act." (ECF No. 33 at 9–10;

*see also id.* at 7 n.2 (the Settlement Agreement "does not supersede or supplant the existing Decision Record"); *id.* at 12 ("The settlement agreement does not formally or informally rescind BLM's plan to zero out the herd area.").) Petitioner further notes that it "is not a party to [the Settlement Agreement] and has no authority to enforce it or allege [a] breach of it." (*Id.* at 10.)

Respondents do not contradict Petitioner's assertion that they have not formally withdrawn the Decision Record, nor Petitioner's assertion that Petitioner has no ability to enforce the Settlement Agreement, nor Petitioner's statement that Respondents still intend to eliminate all horses in the West Douglas Herd Area. Respondents nonetheless appear to assert that they deem themselves bound by the Settlement Agreement's terms. (*See* ECF No. 34 at 2 ("BLM . . . will not to gather any more wild horses in the [West Douglas Herd Area] under the current decision record or without further environmental review."); *id.* at 4 ("because of [the Settlement Agreement], BLM's implementation of the subsequent phase(s) of the Decision Record is constrained"); *id.* at 5 ("further implementation of BLM's Decision Record will never occur due to the settlement agreement filed with the D.C. Circuit"); *id.* at 5 n.2 ("the Decision Record is now inoperative"); *id.* at 9 ("Prior to taking any further actions at the [West Douglas Herd Area], BLM must develop and finalize a new decision record and environmental documentation.").)

Resolving the parties' dispute first requires clarifying the injury, or potential injury, in question. Petitioner repeatedly refers to Respondents' "intentions," "plans," and "ongoing effort[s]" to "zero out" the West Douglas Herd Area. (ECF No. 33 at 4–9.) Petitioner naturally perceives the Decision Record to embody these intentions and

plans, but as for ongoing efforts, Petitioner points to none. Without question, the

Decision Record reveals Respondents' position (at least as of July 2015) that no EIS is

needed before considering whether to remove all horses from the West Douglas Herd

Area; that the Wild Horse Act permits them to remove all horses from the West Douglas

Herd Area; and that all of those horses should be removed. But no party argues that

Respondents can convert that position into action without the Decision Record.

Stated somewhat differently, a concerned party could not bring an APA suit

against an agency arguing that an inoperative decision record shows what an agency

*wants* to do and therefore *likely will do* when the agency issues a new decision record.

Until a new decision record actually issues, there is no "final agency action." 5 U.S.C.

§ 704. And without final agency action, federal courts (in the Tenth Circuit at least) lack

subject matter jurisdiction over an APA lawsuit. *See, e.g.*, *Kansas ex rel. Schmidt v.

Zinke*, 861 F.3d 1024, 1028 (10th Cir. 2017), *cert. petition filed* (Sept. 28, 2017); *Farrell-

Cooper Mining Co. v. United States Dep't of Interior*, 864 F.3d 1105, 1109 (10th Cir.

2017); *Cure Land, LLC v. United States Dep't of Agric.*, 833 F.3d 1223, 1230–31 (10th

Cir. 2016); *Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d

1485, 1494 (10th Cir. 1997).[9]

---

[9] For the record, the undersigned believes that the Tenth Circuit is incorrect to treat APA § 704's "final agency action" requirement as jurisdictional. The notion that § 704 governs subject matter jurisdiction is rooted in the belief that § 704 embodies a waiver of sovereign immunity. *See Schmidt*, 861 F.3d at 1028; *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."). But treating § 704 as a sovereign immunity waiver is almost certainly wrong. The APA's explicit waiver of sovereign immunity comes in § 702, not § 704: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and

Petitioner argues that, unlike the foregoing hypothetical, the Decision Record is not inoperative, but is very much a live document on which Respondents may act. Such an argument gets to the heart of the issue: whether the Decision Record really is inoperative by virtue of the Settlement Agreement, as Respondents now claim.

The jurisdictional effect of the Settlement Agreement may be viewed through three different but related lenses. The first lens is the basic Article III standing requirement that the plaintiff suffer "an injury in fact—an invasion of a legally protected interest which is . . . not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted; certain alterations incorporated). As applied to this case, does Petitioner continue to face any non-conjectural, non-hypothetical injury? If not, the case is moot. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 n.22 (1997) ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (internal quotation marks omitted)).

The second lens is a variation on the mootness doctrine known as "voluntary cessation":

> A special rule applies when the defendant voluntarily stops the challenged conduct. When the conduct stops, the claim will be deemed moot only if two conditions exist:
>
> 1. It is absolutely clear the allegedly wrongful behavior could

---

a judgment or decree may be entered against the United States . . . ." 5 U.S.C. § 702. The undersigned accordingly agrees with the D.C. Circuit's analysis in *Trudeau v. Federal Trade Commission*, 456 F.3d 178, 183–88 (D.C. Cir. 2006), that § 704's final agency action requirement is a basis on which to argue that a petitioner has *failed to state a claim on which relief may be granted*, but *not* that the court lacks subject matter jurisdiction. Nonetheless, the Tenth Circuit has plainly, repeatedly, and very recently treated "final agency action" in § 704 as jurisdictional, so this Court must as well. But even if lack of final agency action is only a basis to dismiss for failure to state a claim, the Court would find that Petitioner has failed to state a claim for essentially the same reasons explained below.

not reasonably be expected to recur.

2. Interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

*EEOC v. CollegeAmerica Denver, Inc.*, 869 F.3d 1171, 1173–74 (10th Cir. 2017) (internal quotation marks and footnotes omitted; alterations incorporated).

The third lens, already touched on above, is the "final agency action" requirement, 5 U.S.C. § 704, which is jurisdictional, *Schmidt*, 861 F.3d at 1028. From a final agency action perspective, the question is whether any challenge to future gathers is ripe.

The Court finds that this dispute is best resolved by primarily employing the voluntary cessation lens. As will become clear below, an analysis of the two voluntary cessation elements under the circumstances of this case shows that one or both of those elements necessarily overlap with an analysis of injury in fact and final agency action. Such an analysis also gives the maximum benefit of doubt to the Petitioner. Under a normal standing analysis, the plaintiff bears the burden of persuasion. *See Lujan*, 504 U.S. at 561; *United States v. Bustillos*, 31 F.3d 931, 933 (10th Cir. 1994). But, under a voluntary cessation analysis, the burden is on the party arguing mootness, as discussed next.

1. <u>"It is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."</u>

The Supreme Court has stated that the party ceasing its challenged conduct bears a "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks omitted; alterations incorporated) ("*Laidlaw*"). "In practice, however, *Laidlaw*'s heavy burden

frequently has not prevented governmental officials from discontinuing challenged practices and mooting a case." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1116 (10th Cir. 2010) ("*Silvery Minnow*"). In particular, "[w]ithdrawal or alteration of administrative policies can moot an attack on those policies." *Id.* at 1117 (internal quotation marks omitted; alterations in original).

This again requires clarification of the "challenged conduct" or "wrongful behavior." If these terms are construed broadly, as Petitioner does, to mean something like "deciding that wild horses can be removed without preparing an EIS," then Petitioner runs into the final agency action requirement. To the Court's knowledge, Respondents have never promulgated *general* guidance that an EIS is never necessary when considering a wild horse roundup. If such general guidance existed, then there would probably be a final agency action to challenge, namely, the general guidance itself. Here, however, Respondents decided under the facts of this case that no EIS was necessary. If the Settlement Agreement in fact nullifies the Decision Record, then Respondents must go through the environmental analysis again before choosing to gather additional horses from the West Douglas Herd Area—and, in going through that analysis, Respondents might reach a different conclusion about the need for an EIS under the facts presently existing (such as, for example, the fact that the herd area now has 167 fewer horses than before). One way or another, until a new decision record issues, there is simply no final agency action, and so no jurisdiction. *Cf. Ramsey v. Kantor*, 96 F.3d 434, 446 (9th Cir. 1996) (finding a dispute moot because the governmental agency's future actions "would no longer be relying on the particular biological opinion that was being challenged, but rather upon a new opinion" based on

18

"different criteria or factors").

Given this, the Court turns to the most important question for purposes of the first element of the voluntary cessation inquiry: whether the Settlement Agreement indeed nullifies the Decision Record, thus nullifying Respondents' ability to relocate more horses without a new decision record. This question basically turns on whether Respondents can be trusted to abide by the Settlement Agreement. There is no clear set of rules to guide this inquiry. "Predictions of the future must be made, and often require both practical sense and sophisticated judgment." 13C Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 3533.7 (3d ed., Apr. 2017 update) ("*Wright & Miller*").

One factor courts have found influential in this analysis is the formal withdrawal or supersession of an administrative action, *Silvery Minnow*, 601 F.3d at 1111–13, as compared to a "mere informal promise or assurance on the part of the governmental defendants that the challenged practice will cease," *id*. at 1118 (internal quotation marks omitted; alterations incorporated). Here, Respondents' actions fall somewhere in between these poles. Petitioner is correct that the Decision Record has never been formally abrogated, withdrawn, or superseded (such as through a Federal Register notice).[10] But Respondents are correct that, by filing the Settlement Agreement with the D.C. Circuit, they have made it a matter of public record that they intend to treat the Decision Record as "not authoriz[ing] future removals without additional decision-making," and that they "will issue a new decision record before authorizing future

---

[10] One would expect such an action to be announced in the Federal Register, but Respondents have not cited the Court to any such document, nor could the Court find such a document through its own efforts.

removals of wild horses from the [West Douglas Herd Area]." (ECF No. 30-1 ¶¶ 1, 3.)

Nonetheless, the Settlement Agreement *also* disavows any intent to permit enforcement

by any party but Friends of Animals. (*Id.* ¶ 8.)

Thus, the Settlement Agreement is neither a formal withdrawal of the decision

record nor a mere informal promise. But the context of the *Friends of Animals* case,

from which the Settlement Agreement resulted, provides additional assurance that it is

genuine.

In *Friends of Animals*, Respondents specifically represented to the D.C. district

court that "that any future gather would be subject to additional notice, comment,

analysis, and judicial review procedures." 236 F. Supp. 3d at 134. This was so, in part,

because BLM's internal handbook regarding wild horse roundup procedures requires

"notice of [a roundup] decision '31 to 76 days prior to the proposed gather start [date] to

provide an opportunity for administrative review of the decision.'" *Id.* at 135 (quoting

BLM, *Removal Manual* § 4720.36 (2010)). Given this, the district court reasoned that

the Decision Record could not be deemed "the required notice for all future gathers in

the [West Douglas Herd Area]: Any notice provided in 2015 would have been issued far

*more* than '76 days prior to [a hypothetical future] gather start.'" *Id.* (emphasis and

alterations in original).

The arguments the district court accepted from Respondents are essentially what

Respondents and Friends of Animals embodied in their Settlement Agreement. But,

even apart from the Settlement Agreement, a challenger would have a strong case

against Respondents for judicial estoppel if it deviated from the course of conduct it told

the D.C. district court it would follow. *See New Hampshire v. Maine*, 532 U.S. 742,

749–51 (2001).

This review of *Friends of Animals* is also a helpful segue to another factor courts have considered important when evaluating whether the challenged conduct is reasonably likely to recur, namely, whether the governmental entity has shown clear reluctance in submitting to a challenger's demands. *See Silvery Minnow*, 601 F.3d at 1117. *Friends of Animals* shows almost the opposite. Respondents, through the Settlement Agreement, committed largely to actions already prescribed by BLM internal procedures.[11] Moreover, Respondents won their case in the district court and only needed to defend it before the D.C. Circuit on an abuse-of-discretion standard of review. *See Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718, 724 n.3 (D.C. Cir. 2012) (prudential standing decisions reviewed for abuse of discretion); *accord Silvery Minnow*, 601 F.3d at 1123–28. Thus, there is no suggestion that Respondents entered the Settlement Agreement with any amount of reluctance. Respondents, to the contrary, occupied a much stronger litigation position than did Friends of Animals when they executed the Settlement Agreement.

Finally, practically speaking, the only way Respondents could take further action based on the current Decision Record would be through a choice on their part to disregard the Settlement Agreement (and BLM internal guidance), and a choice on Friends of Animals's part to do nothing. There is no reasonable basis to think that this is anything more than a theoretical possibility, rather than a realistic possibility. A defendant need not rule out all theoretical possibilities to establish the first element of

---

[11] As far as the Court can discern, the major concession to Friends of Animals was release of environmental analysis documents at least thirty days ahead of any final decision. (*See* ECF No. 30-1 ¶ 4.)

the voluntary cessation test.  *See Silvery Minnow*, 601 F.3d at 1117.  If the recurrence

of the conduct "is only a speculative contingency," it is no longer a "live controversy."  *Id.*

In light of the foregoing, the Court finds that Respondents have sufficiently

established that there is no reasonable possibility they would act on the current

Decision Record to gather additional wild horses in the West Douglas Herd Area.

2.     "Interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."

The "alleged violation" in this case is the Decision Record.  For the reasons

already stated, the Court agrees with Respondents that the Decision Record is, for all

intents and purposes, "inoperative."  (ECF No. 34 at 5 n.2.)  Given that, Respondents

have "eradicated" that Decision Record because they cannot act on it.  This element is

accordingly satisfied.[12]  As such, Respondents satisfy the test for mootness through

voluntary cessation.  And the other side of that coin is that any challenge to

Respondents' contemplated future actions is not ripe given the lack of a final agency

action under APA § 704.

3.     Synthesis

"[I]f the court is persuaded that the defendant will behave as promised and that

any failure can be corrected in a future action," a case is properly mooted by voluntary

cessation.  13C *Wright & Miller* § 3533.7.  The Court is so persuaded.  Petitioner

remains capable of bringing an APA challenge to future to Respondents' future

decisions regarding the West Douglas Herd Area.  To the extent those decisions place

any reliance on anything contained within the current Decision Record, those materials

_____

[12] No party argues that this Court can grant some sort of relief with respect to the 167 horses already relocated (*e.g.*, an order that they be returned, or an order that the West Douglas Herd Area be repopulated through excess horses gathered elsewhere).

would themselves become a part of the new decision record and would be reviewable in that context.

Moreover, to ensure the Respondents' genuineness with respect to the effect of the Settlement Agreement, the Court will explicitly retain jurisdiction to evaluate any change in circumstances that might restore subject matter jurisdiction (such as Respondents' failure to follow the Settlement Agreement); and, conversely, any change in circumstances that removes, beyond all possible doubt, Respondents' ability to act on the current Decision Record (such as formal supersession).

## B.    "Capable of Repetition Yet Evading Review"

Petitioner additionally argues, however, that the Court should retain jurisdiction over the dispute as currently framed (*i.e.*, the dispute over the current Decision Record) under the mootness exception for actions that are capable of repetition yet likely to evade review.

> The capable-of-repetition doctrine applies only in exceptional situations where the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.

*Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (internal quotation marks and citations omitted; alterations incorporated).

Petitioner argues that it satisfies the first element of this exception because "wild horse gathers are quickly announced and carried out."  (ECF No. 33 at 8.)  If this is Petitioner's true grievance, then Petitioner should seek to invalidate BLM's internal guidance requiring announcements of roundups no more than 76 days ahead of time.

*See Friends of Animals*, 236 F. Supp. 3d at 135.[13]

As to any particular roundup Respondents might in the future announce, the procedures dictated by the Settlement Agreement and by BLM's internal guidance will result in advance notice to the public.  Given that advance notice, Petitioner can prepare a timely appeal to the IBLA and a motion to stay pending appeal.  *See* 43 C.F.R. § 4.21(b) (regulations governing stays pending appeal to the IBLA).  Or, if such an administrative appeal would be futile (as it may very well be in Petitioner's case), Petitioner will have time to prepare an APA lawsuit and a motion to stay agency action under 5 U.S.C. § 705.  To the extent Petitioner can satisfy the factors necessary for either type of stay, it will prevent the new action from becoming moot.  To the extent Petitioner cannot satisfy those factors, it faces the same risk as every other litigant that fails to obtain (or never seeks) preliminary relief, namely, that the defendant will take some action that moots the case.  Thus, Petitioner has not shown that future roundup decisions regarding the West Douglas Herd Area will be carried out so quickly that they are perpetually likely to evade review.

This case is also unlike *American Wild Horse Preservation Campaign v. Jewell*, 847 F.3d 1174 (10th Cir. 2016), in which the Tenth Circuit found that the capable-of-repetition-yet-evading-review exception saved the dispute from mootness.  *See id.* at 1185–86.  *American Wild Horse* focused on 16 U.S.C. § 1334, a portion of the Wild Horse Act that dictates BLM's responsibilities when wild horses stray from public land

_____

[13] This, of course, would require Petitioner to overcome BLM's likely position that it is acting precisely as the Wild Horse Act requires, *i.e.*, to "*immediately* remove excess animals from the range" when it determines "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals."  16 U.S.C. § 1333(b)(2) (emphasis added).

on to privately owned land, and in particular, requires BLM to retrieve those horses and return them to public lands. *See* 847 F.3d at 1179. BLM had interpreted § 1334 as permitting it to relocate *all* wild horses in a particular range, whether on public or private land, because it was practically infeasible to prevent wild horses on that range from continually straying back onto private land. *Id.* at 1182. That decision was the basis for a roundup in 2014 that, obviously, was completed long before the Tenth Circuit issued its opinion in 2016. *Id.*

The Tenth Circuit applied the capable-of-repetition-yet-evading-review exception for two reasons. First, the Tenth Circuit found under the circumstances of that case that the roundup happened too quickly to be challenged effectively. *Id.* at 1185.[14] Second, the Tenth Circuit had received a Federal Rule of Appellate Procedure 28(j) letter informing it that BLM had recently issued a decision to gather another set of horses from the same range under the same justifications, including the same interpretation of § 1334. *Id.* at 1185–86.

The Tenth Circuit's first justification is somewhat similar to what Petitioner asserts here, but Petitioner has made no record that it could not have attempted to stop the September 2015 roundup before it was complete. The Tenth Circuit's second justification has no analog in this case. As far as the Court has been made aware, BLM has not announced any other roundups in the West Douglas Herd Area. Moreover, it is not clear that BLM's future actions in the West Douglas Herd Area will be driven by a statutory interpretation similar to any interpretation underlying the September 2015 roundup. Without a similar document in this case, there is no clear guidance on what

---

[14] The Tenth Circuit made no mention of any attempt by the challenger to seek a stay from the IBLA or the district court.

BLM will do in the future, and—more importantly—there is not even a semblance of final agency action as to future roundups, thus preventing the Court from exercising subject matter jurisdiction under APA § 704.

For all of these reasons, the capable-of-repetition-yet-evading-review exception is not appropriate.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  The Court's Order to Show Cause (ECF No. 32) is MADE ABSOLUTE;

2.  This action is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction;

3.  The Court RETAINS JURISDICTION to evaluate the jurisdictional effect of any change in circumstances that might restore subject matter jurisdiction, or that might remove, beyond all possible doubt, Respondents' ability to act on the current Decision Record;

4.  Respondents' Motion for Leave to File Sur-Reply (ECF No. 21) is DENIED AS MOOT; and

5.  The Clerk shall terminate this case.  The parties shall bear their own costs and fees.

Dated this 29th day of November, 2017.

BY THE COURT:

William J. Martinez
United States District Judge